UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANDREW AUSTIN and JEFFREY HALE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NAVIA BENEFIT SOLUTIONS, INC.,<br><br>Defendant. | No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Andrew Austin and Jeffrey Hale ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Navia Benefit Solutions, Inc., ("Navia" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

1. This class action arises out of Defendant Navia's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiffs' and Class members' (defined below) sensitive personal identifiable information that it had acquired and stored for its business purposes.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

2. According to its website Defendant Navia is a national, Health and Wealth Benefits provider utilizing "AI-powered personalization with human support to help employees maximize every benefit dollar by spending smarter, saving more, and reducing financial stress,"[1] "serving 10,000+ clients across all 50 states."[2]

3. According to the HIPAA Journal, Navia exposed the personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") belonging to Plaintiffs and more than 2.7 million Class members.[3] Beginning on or about December 22, 2025, and continuing for almost one month, until January 15, 2026,[4] a known cybercriminal gang was able to access and exfiltrate the Private Information of more than 2.7 million individuals that Navia managed on behalf of its clients (the "Data Breach").[5] The HIPAA Journal reports that records going back seven years were compromised in the Data Breach.

4. On approximately March 18, 2026, Navia announced on its web site that "[o]n January 23, 2026, Navia discovered suspicious activity related to our environment. Navia promptly responded and launched an investigation to confirm the nature and scope of the incident. The investigation determined that an unauthorized actor accessed and potentially acquired certain information between December 22, 2025, and January 15, 2026,"[6] including names, dates of birth, Social Security number, phone number, email address, and health plan information.[7]

5. Defendant has reported that the Data Breach is the result of hacking. Navia admitted that "[a]t this time, we have been informed that a Broken Object Level

---

[1] https://www.naviabenefits.com/ (last visited March 24, 2026).
[2] https://www.linkedin.com/company/navia-benefit-solutions-inc/ (last visited March 24, 2026).
[3] https://www.hipaajournal.com/navia-benefit-solutions-data-breach/ (last visited March 24, 2026).
[4] *Id.*
[5] *Id.*
[6] https://www.naviabenefits.com/notice-of-data-event/ (last visited March 24, 2026).
[7] *Id.*



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Authorization (BOLA) vulnerability led to an unknown actor accessing Navia data."[8]

6. Due to Defendant's data security failures which resulted in the Data Breach, cybercriminals were able to target Defendant's computer systems and exfiltrate Plaintiffs' and Class members' highly sensitive Private Information. As a result of this Data Breach, Plaintiffs' and Class Members' Private Information was compromised and stolen and remains in the hands of those cybercriminals.

7. Despite apparently learning of the Data Breach on or about January 23, 2026, and determining that Private Information was involved in the breach, Defendant failed to provide notice, or any information concerning the Breach to the individuals affected, including Plaintiffs and Class members until March 18, 2026. *See, e.g.*, Notice of Security Incident, attached as Exhibit "A."

8. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiffs' and Class members' Private Information with which it was entrusted for either benefits administration or employment or both.

9. Plaintiffs bring this class action lawsuit on behalf of themselves and all other similarly situated persons to address Defendant's inadequate safeguarding of Class members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class members that their information had been subject to the unauthorized access of an unknown third party and failing to include in that belated and inadequate notice precisely what specific types of information were accessed and taken by cybercriminals.

10. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a

[8] https://www.bleepingcomputer.com/news/security/hackerone-discloses-employee-data-breach-after-navia-hack/ (last visited March 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that network in a dangerous condition.

11. Defendant also failed to provide timely, accurate, and adequate notice to Plaintiffs and other Class Members that their PII and PHI had been stolen, as well as precisely what types of information were stolen.

12. Defendant disregarded Plaintiffs' and Class members' rights by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class members with prompt and full notice of the Data Breach.

13. In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computer network and systems, it would have discovered the massive intrusion sooner rather than allowing cybercriminals unimpeded access to Plaintiffs' and Class members' PII and PHI.

14. Plaintiffs' and Class members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

15. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including: opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members'



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

information to obtain government benefits, filing fraudulent tax returns using Class members' information, filing false medical claims using Class members' information, obtaining driver's licenses in Class members' names but with another person's photograph, and giving false information to police during an arrest.

16. As a result of the Data Breach, Plaintiffs and Class members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

17. Plaintiffs and Class members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

18. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all other similarly situated individuals whose Private Information was accessed during the Data Breach.

19. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring funded by Defendant, and declaratory relief.

## PARTIES

20. Plaintiff Andrew Austin is and at all times mentioned herein was an individual citizen of the State of Minnesota, and is a Data Breach victim.

21. Plaintiff Jeffrey Hale is and at all times mentioned herein was an individual citizen of the State of Idaho, and received a Notice of Security Incident, attached as Exhibit "A."

22. Defendant Navia Benefit Solutions, Inc., is a Washington corporation, with its principal place of business located at 707 South Grady Way, Suite 350, Renton, WA,



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

98057.

## FACTUAL ALLEGATIONS

### Defendant's Business

23. Navia offers "comprehensive benefits administration, retirement, CDH, finance, lifestyle, and compliance solutions to employers and deliver industry-leading customer service, communications, and technology."[9] Navia claims that "[m]anaging employee benefits is a critical function, but hidden risks can turn it into a costly liability."[10]

24. On its website, Navia claims that it provides services "across various industries. Our flexible and adaptable approach enables us to effectively support clients across a wide range, from high-tech to manufacturing."[11]

25. In the ordinary course of receiving Defendant's services and products, each individual must provide (and Plaintiffs did provide) Defendant with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;
- Date of birth;
- Social Security number;
- driver's license numbers;
- payment and financial account information;
- health insurance information; and
- medical information.

26. On information and belief, Defendant also stores medical records and other protected health information for its employees, clients and other individuals, records of treatments and diagnoses.

---

[9] https://www.linkedin.com/company/navia-benefit-solutions-inc/ (last visited March 25, 2026).
[10] *Id.*
[11] https://www.naviabenefits.com/about/ (last visited March 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

27. Regarding its Data Security, Defendant represents that "[d]ata security is paramount in today's digital age, especially when handling sensitive employee information. The recent data breach whereby social security numbers were compromised affected millions. It's important to ensure your benefits administration solution adheres to the highest levels of security. Look for services that offer:

Advanced Encryption: Protect employee data with innovative security protocols.

Compliance with Standards: Ensure your platform meets industry standards such as GDPR and HIPAA.

A secure platform not only protects your organization from potential breaches but also builds trust with your employees, knowing their personal information is safe."[12]

28. Thus, Navia was clearly on notice regarding the importance of adequate data security and, relatedly, its inadequate data security practices.

29. Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

30. Yet, through its failure to properly secure Plaintiffs' and Class members' Private Information, Defendant failed to meet its own promises of privacy.[13]

31. Thus, the potential for improper disclosure of Plaintiffs' and Class members' PII and PHI was a known risk to Defendant, and Defendant was on notice that failing to take steps necessary to secure the PII and PHI from those risks left its network in a dangerous condition.

32. Defendant and its employees failed to properly monitor the computer

---

[12] https://www.naviabenefits.com/11-key-features-for-a-benefits-administration-solution/#Data (last visited March 24, 2026).

[13] https://www.naviabenefits.com/privacy-policy-and-notice/ (last visited March 24, 2026).



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

network and systems that housed the PII and PHI. Had Defendant properly monitored the network, it would have prevented this breach altogether.

**The Data Breach**

33. A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

34. On or about March 18, 2026, Navia announced that it experienced a security incident disrupting access to its systems. As above, the breach occurred when "a Broken Object Level Authorization (BOLA) vulnerability led to an unknown actor accessing Navia data."[14] It is clear that an unknown ransomware group stole massive amounts of data from Navia's information network.

35. Presently, however, Defendant has provided no public information on the ransom demand or payment.

36. On information and belief, Plaintiffs' and Class members' stolen Private Information has now been published by cybercriminals to the Dark Web as that is the modus operandi of ransomware attackers.[15]

37. As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[16]

---

[14] https://www.bleepingcomputer.com/news/security/hackerone-discloses-employee-data-breach-after-navia-hack/ (last visited March 24, 2026).

[15] https://www.paloaltonetworks.com/cyberpedia/what-is-multi-extortion-ransomware (Typically, in a ransomware attack, the criminal actor will not only encrypt the victim's system and block access until a ransom is paid but also exfiltrate data and threaten to release it to the dark web if a ransom is not paid. This scheme is known as a double-extortion attack. This scheme is used because many "organizations overcome the threat of file encryption with a simple up-to-date backup system.").

[16] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

38. In January 2023, now three years before the attack, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendant of the severe threats posed by cybercriminal groups.[17] Within the healthcare and benefits industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

39. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures to protect its clients' and employees' Private Information. Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

40. Defendant had obligations created by HIPAA, FTCA, contract, industry standards, common law, and representations made to Plaintiffs and Class members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

41. Plaintiffs and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice.***

42. It is well known that PII and PHI, including Social Security numbers in particular, are a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Defendant, are well-aware of the risk of being targeted by cybercriminals.

43. Individuals place a high value on the privacy of their PII and PHI. Identity theft causes severe negative consequences to its victims, as well as severe distress and

[17] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last visited March 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

hours of lost time trying to fight against the impact of identity theft.

44. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[18]

45. Individuals, like Plaintiffs and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing one's DNA for hacker's purposes.

46. Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse.

47. The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially

[18] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited March 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

true if your other personal information, such as your name and address, remains the same."[19]

48. In 2021, there was a 15.1% increase in cyberattacks and data breaches from 2020. Over the next two years, in a poll of security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable cases will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[20] That trend continues. According to the Identity Theft Resource Center (ITRC), there was a new record for the number of data compromises tracked in a year, up four percentage points in 2025 (3,322) from the previous all-time high in 2023 (3,202).[21] Significantly, according the ITRC report, 88 percent of people who received a data breach notice experienced at least one negative consequence after a breach, including an increase in "phishing" or scam attempts (40 percent), an increase in spam emails or robocalls (49 percent) and attempted takeover of an existing account (40 percent).[22]

49. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

50. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause

---

[19] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited March 24, 2026).
[20] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited March 24, 2026).
[21] https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/#:~:text=Consumer%20Attitudes%20About%20Data%20Breach,phishing%20attempts%20after%20a%20breach (last visited March 24, 2026).
[22] *Id.*



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

costly disruptions to operations and the loss of critical information and data."[23] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[24]

51. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII and PHI private and secure, Defendant failed to take appropriate steps to protect Plaintiffs' and the proposed Class's PII and PHI from being compromised.

***Data Breaches are Rampant in Healthcare.***

52. Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry (and industries adjacent to healthcare) preceding the date of the breach.

53. According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[25]

54. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers,

---

[23] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited March 24, 2026).
[24] *Id.*
[25] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited March 24, 2026).



McNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[26]

55. The HIPAA Journal article goes on to explain that patient records, like those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[27]

56. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[28]

57. The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant.

***Defendant Failed to Comply with FTC Guidelines.***

58. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

59. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information

---

[26] *Id.*
[27] *Id.*
[28] https://www.ahu.edu/blog/data-security-in-healthcare (last visited March 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[29] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[30]

60. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

61. The FTC has brought enforcement actions against businesses, like that of Defendant, for failing to adequately and reasonably protect individuals' data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62. These FTC enforcement actions include actions against entities that collect PHI like Defendant.

63. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act or

---

[29] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 24, 2026).
[30] *Id.*



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

64. Defendant was at all times fully aware of its obligation to protect the PII and PHI of its employees, clients, and other individuals. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Industry Standards.***

65. As shown above, experts studying cyber security routinely identify healthcare providers and related entities as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

66. Cybersecurity experts have identified several best practices that companies, like Defendant, should implement, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

67. Other standard cybersecurity best practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

68. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

69. These frameworks are existing and applicable industry standards for all



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

businesses, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

***Defendant's Conduct Violates HIPAA.***

70. HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

71. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

72. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

73. A Data Breach, such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.402.

74. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate its failure to comply with safeguards mandated by HIPAA.

***Defendant Breached its Obligations to Plaintiffs and Class.***

75. Defendant breached its obligations to Plaintiffs and Class members and/or



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and the Private Information entrusted to it. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect individuals' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

g. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

h. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

i. Failing to protect against reasonably anticipated uses or disclosures of



McNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

k. Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding data security, as well as PHI, as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

l. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

76. As a result of maintaining its computer systems in manner that required security upgrading, failing to implement adequate procedures for handling emails containing ransomware or other malignant computer code, and failing to adequately train its employees, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class members' Private Information.

77. Accordingly, as outlined below, Plaintiffs and Class members now face an increased risk of fraud and identity theft.

***Data Breaches Put Consumers at an Increased Risk Of Fraud and Identify Theft***

78. Data Breaches such as the one Plaintiffs and Class members experienced cause significant disruption to the overall daily lives of victims affected by the attack.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

79. In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[31] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiffs and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

80. The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

81. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

82. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

83. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

84. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised,

[31] https://www.gao.gov/assets/gao-19-230.pdf (last visited March 24, 2026).
[32] *See* https://www.identitytheft.gov/Steps (last visited March 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

criminals often trade the information on the "cyber black-market" for years.

85. There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class members must vigilantly monitor their financial and medical accounts for many years to come.

86. Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[33] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[34] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

87. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

---

[33] *Identity Theft and Your Social Security Number*, Social Security Administration at 1 (2018), available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited March 24, 2026).

[34] *Id.* at 4.

[35] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited March 24, 2026 ).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

88. This data, as one would expect, commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[36]

89. In recent years, the medical and financial industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**Plaintiff Andrew Austin's Experiences**

90. Plaintiff Andrew Austin received his Notice of Data Incident on March 18, 2026.

91. Since the Data Breach, Plaintiff Austin has tried to mitigate the damage by changing his passwords, contacting the credit bureaus as Defendant instructed, and monitoring his financial accounts for about 2 and a half hours per week. This is more time than he spent prior to learning of the Defendant's Data Breach. Having to do this every week not only wastes his time as a result of Defendant's negligence, but it also causes him great anxiety.

92. Soon after the Data Breach, Plaintiff Austin began receiving an excessive number of spam calls on the same cell phone number provided to Defendant on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen PII/PHI.

93. Plaintiff Austin is aware that cybercriminals often sell Private Information,

[36] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited March 25, 2026).



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

94. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII/PHI being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

95. Plaintiff has experienced anxiety and increased concerns arising from the fact that his PII/PHI has been or will be misused and from the loss of his privacy.

96. The risk is not hypothetical. Here, a known hacking group intentionally stole the data, misused it, and on information and belief has threatened to publish, or has published it on the Dark Web. The sensitive information involved, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

97. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII/PHI—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and as such will include future costs and expenses.

98. Plaintiff has a continuing interest in ensuring that his PII/PHI which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

99. Had Plaintiff Austin been aware that Defendant's computer systems were not secure, he would not have entrusted Defendant with his PII and PHI.

**Plaintiff Jeffrey Hale's Experiences**

100. Plaintiff Jeffrey Hale received his Notice of Data Incident on March 18, 2026. See Exhibit A.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

101. Since the Data Breach, Plaintiff Hale has tried to mitigate the damage by changing his passwords, contacting the credit bureaus as Defendant instructed, and monitoring his financial accounts for about 2 and a half hours per week. This is more time than he spent prior to learning of the Defendant's Data Breach. Having to do this every week not only wastes his time as a result of Defendant's negligence, but it also causes him great anxiety.

102. Soon after the Data Breach, Plaintiff Hale began receiving an excessive number of spam calls on the same cell phone number provided to Defendant on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen PII/PHI.

103. Plaintiff Hale is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

104. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII/PHI being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

105. Plaintiff has experienced anxiety and increased concerns arising from the fact that his PII/PHI has been or will be misused and from the loss of his privacy.

106. The risk is not hypothetical. Here, a known hacking group intentionally stole the data, misused it, and on information and belief has threatened to publish, or has published it on the Dark Web. The sensitive information involved, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

107. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII/PHI—a form of intangible property that Plaintiff



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

entrusted to Defendant, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and as such will include future costs and expenses.

108. Plaintiff has a continuing interest in ensuring that his PII/PHI which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

109. Had Plaintiff Hale been aware that Defendant's computer systems were not secure, he would not have entrusted Defendant with his PII and PHI.

**Plaintiffs' And Class Members' Common Injuries**

110. To date, Defendant has done absolutely nothing to compensate Plaintiffs and Class members for the damages they sustained in the Data Breach.

111. Furthermore, Defendant's failure to safeguard Plaintiffs' and Class members' Private Information places the burden squarely on Plaintiffs and the Class, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts and omissions resulting in the Data Breach.

112. Plaintiffs and Class members have been damaged by the compromise and exfiltration, by cyber-criminals, of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

113. Plaintiffs and Class members were damaged in that their Private Information is now in the hands of cyber criminals being sold and potentially for sale for years into the future.

114. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

115. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been forced to expend time dealing with the effects of the Data Breach.

116. Plaintiffs and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, for medical care and services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

117. Plaintiffs and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class members.

118. Plaintiffs and Class members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

119. Plaintiffs and Class members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

120. Plaintiffs and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

Moreover, Plaintiffs and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

121. Further, as a result of Defendant's conduct, Plaintiffs and Class members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

122. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach ***since January 23, 2026*** and only notified the impacted individuals, including Plaintiff and Class members on March 18, 2026. Defendant offered no explanation of purpose for the delay. This delay violates HIPAA and other notification requirements and increased the injuries to Plaintiffs and Class.

## CLASS ALLEGATIONS

123. Plaintiffs bring this nationwide class action individually and on behalf of all other persons similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

124. Plaintiffs proposes the following Class definition, subject to amendment based on information obtained through discovery:

**Nationwide Class:**

> **All individuals whose Private Information was compromised in the Data Breach beginning on or about December 22, 2025.**

125. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

126. Plaintiffs reserve the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

127. Certification of Plaintiffs' claim for class-wide treatment is appropriate because Plaintiffs can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

128. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Rule 23 of the Federal Rules of Civil Procedure:

129. **Numerosity:** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Private Information of approximately 2.7 million of Defendant's clients, employees and other individuals was compromised in the Data Breach. Such information is readily ascertainable from Defendant's records.

130. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, the FTC Act and HIPAA;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether hackers obtained Plaintiffs' and Class Members' Private



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Information in the Data Breach;

f. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

g. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

h. Whether Defendant breached the covenant of good faith and fair dealing implied in its contracts with Plaintiffs and Class Members; and

i. Whether Plaintiffs and the Class Members are entitled to damages, civil penalties, and/or injunctive relief.

131. **Typicality:** The claims or defenses of Plaintiffs are typical of the claims or defenses of the proposed Class because Plaintiffs' claims are based upon the same legal theories and same violations of law. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

132. This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes Defendant's employees, clients, and other individuals, the legal and factual issues are narrow and easily defined, and the Class Membership is limited. The identity of the Class Members can be identified from Defendant's records, such that direct notice to the Class Members would be appropriate.

133. In addition, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

134. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include,



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

but are not limited to:

a. Whether Defendant failed to timely and adequately notify the public of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard individuals' and employees' Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

135. Further, this action satisfies Rule 23 because: (i) common questions of law and fact predominate over any individualized questions; (ii) prosecuting individual actions would create a risk of inconsistent or varying adjudications, risking incompatible standards of conduct for Defendant, and a risk adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interest; and (iii) the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

136. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the



McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Data Breach by Defendant.

**CLAIMS FOR RELIEF**
**COUNT I**
**Negligence**
(On Behalf of Plaintiffs and Class Members)

137. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

138. Defendant required Plaintiffs and Class members to submit non-public personal information in order to obtain services and/or employment.

139. By collecting and storing this data in Defendant's computer network and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

140. Defendant owed a duty of care to Plaintiffs and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

141. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its clients/employees. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a Data Breach.

142. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative,



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

143. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

144. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

145. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class members' Private Information;

e. Failing to detect in a timely manner that Class members' Private Information had been compromised; and

f. Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

and other damages.

146. It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare and related industries.

147. It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

148. Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

149. Defendant's negligent conduct is ongoing, in that, on information and belief, it still holds the Private Information of Plaintiffs and Class members in an unsafe and unsecure manner.

150. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

## COUNT II
**Breach of Third Party Beneficiary Contract**
(On Behalf of Plaintiffs and Class Members)

151. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

152. As discussed above, Defendant entered into contracts, written or implied, with its clients to perform services. Upon information and belief, these contracts are virtually identical between and among Defendant and its clients around the country on behalf of which Defendant provided services for consumers, including Plaintiffs and Class



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Members affected by the Data Breach.

153. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

154. These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts.

155. Defendant knew that if it were to breach these contracts, consumers for which it was providing services, Plaintiffs and Class Members, would be harmed.

156. Defendant breached the contracts by, among *inter alia*, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiffs and Class Members thereof.

157. Plaintiffs and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

158. Plaintiffs and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

159. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered and will continue to suffer damages in an amount to be proven at trial.

160. In addition to monetary relief, Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiffs and Class members for a period of ten years.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**COUNT III**
**Breach of Implied Contract**
(On Behalf of Plaintiffs and Class Members)

161. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

162. This Claim is pleaded in the alternative to Count III above.

163. When Plaintiffs and Class members provided their Private Information to Defendant in exchange for Defendant's for services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

164. Defendant solicited, offered, and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class members accepted Defendant's offers and provided their Private Information to Defendant.

165. In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

166. Plaintiffs and Class members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

167. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

168. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

169. Plaintiffs and Class members fully and adequately performed their obligations under the implied contracts with Defendant.

170. Defendant breached its implied contracts with Class members by failing to safeguard and protect their Private Information.

171. As a direct and proximate result of Defendant's breach of the implied contracts, Class members sustained damages as alleged herein, including the loss of the benefit of the bargain.

172. Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

173. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class members.

## COUNT IV
**Unjust Enrichment**
(On Behalf of Plaintiffs and Class Members)

174. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

175. Plaintiffs bring this claim individually and on behalf of all Class members.

176. This Claim is pleaded in the alternative to Counts II and III above.

177. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class members.

178. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class members was to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

179. Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they purchased services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class members should have received services from Defendant and had their Private Information protected with adequate data security.

180. Defendant knew that Plaintiffs and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class members for business purposes.

181. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

182. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

183. Defendant failed to secure Plaintiffs' and Class members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class members provided.

184. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

185. If Plaintiffs and Class members knew that Defendant had not reasonably



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

186. Plaintiffs and Class members have no adequate remedy at law.

187. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

188. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm.

189. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid for Defendant's services.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

a. For an Order certifying this action as a Class action and appointing Plaintiffs as a Class Representative;

b. For equitable relief enjoining Navia from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class members' PII/PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class members;

c. For equitable relief compelling Navia to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d. Ordering Navia to pay for not less than three years of credit monitoring for Plaintiffs and the Class;

e. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

g. Pre-and post-judgment interest on any amounts awarded; and,

h. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

DATED this 25th day of March, 2026.

McNAUL EBEL PLLC

By: *s/ Kaleigh N. Boyd*
Kaleigh N. Boyd, WSBA No. 52684
600 University Street, Suite 2700
Seattle, Washington 98101
Phone: (206) 467-1816
Fax: (206) 624-5128
Email: kboyd@mcnaul.com

Marc H. Edelson*
Liberato P. Verderame*
EDELSON LECHTZIN LLP
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com
lverderame@edelson-law.com

*Attorneys for Plaintiffs and the Putative Class*

* *Pro hac vice forthcoming*